IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| *The Estate of Winifred P. Painter*, | C/A No. 2:10-CV-1096-MBS |
| Plaintiff, | |
| vs. | |
| Bennett Baker Strahan, | **OPINION AND ORDER** |
| Defendant. | |
| Bennett Baker Strahan, | |
| Counter Claimant, | |
| vs. | |
| *The Estate of Winifred P. Painter*, | |
| Counter Defendant. | |

    This action concerns the ownership of a historic townhome located in downtown Charleston, South Carolina, at 98 King Street (the "Property"). The Property was purchased by Winifred "Wendy" Painter ("Wendy Painter") in August 2004. Approximately one month later, Wendy Painter deeded it to herself and Defendant Bennett Baker Strahan ("Defendant") as joint tenants with right of survivorship. Wendy Painter died in March 2010 and, shortly thereafter, her estate ("Plaintiff") filed the instant action. Plaintiff claims that Wendy Painter never intended that Defendant own the Property. Accordingly, Plaintiff requests that the Court find either that Defendant was unjustly enriched and his actions gave rise to a constructive trust, Am. Compl. ¶¶ 24–25 (First Cause of

1

Action), ECF No. 28, or Defendant held legal title to the Property for the benefit of Wendy Painter under a "resulting trust" theory, id. at ¶¶ 26–27 (Second Cause of Action), and order an accounting, id. at ¶¶ 28–29 (Third Cause of Action). Defendant has, in turn, asserted counterclaims for intentional interference with a prospective contract, Am. Answer & Countercl. ¶ 46 (First Counterclaim), ECF No. 30; abuse of process, id. at ¶¶ 47–49 (Second Counterclaim); and bailment, id. at ¶ 52 (Fifth Counterclaim).[1]

This matter came before the Court on January 18, 2011 for a hearing on the parties' cross-motions for partial summary judgment, ECF Nos. 38, 50, and Defendant's motion to amend or correct his counterclaims, ECF No. 39. After reviewing the parties' papers and hearing their arguments, the Court GRANTED Plaintiff's motion for partial summary judgment, DENIED Defendant's motion to amend, and reserved judgment on Defendant's motion for partial summary judgment. This order sets forth the Court's reasoning.

## I.  BACKGROUND

The following facts appear to be undisputed. Wendy Painter separated from her husband, Dean Painter, in July of 2003. Am. Compl. ¶ 7, ECF No. 28; Consent J. & Equitable Distribution Order ¶ 2, ECF No. 30-2. By late 2003 or early 2004, Wendy Painter had begun a romantic relationship with Defendant. See Def.'s Resp. 1, ECF No. 45; Michael Painter Dep. 51:13–21, ECF No. 45-1. Wendy Painter had been living in Raleigh, North Carolina; but, early in the Spring of 2004, Defendant and Wendy Painter began looking for a home to purchase in Charleston, South

---

[1] At the hearing, Defendant withdrew his counterclaims for violation of South Carolina's Frivolous Proceedings Sanction Act, Am. Answer & Countercl. ¶ 50 (Third Counterclaim), ECF No. 30, and defense costs, id. at ¶ 51 (Fourth Counterclaim).

2

Carolina. Bennett Strahan Dep. 7:10–12, ECF No. 45-2. The search was successful and, on or about July 27, 2004, Defendant executed a contract to purchase the Property for $1,750,000, to be paid in cash. See Am. Compl. ¶ 9, ECF No. 28; Am. Answer & Countercl. ¶ 7, ECF No. 30. The seller was provided an earnest money deposit of $50,000, which was drawn from Wendy Painter's personal funds. Am. Compl. ¶ 9, ECF No. 28; Bennett Strahan Dep. 9:8–17, ECF No. 38-9.

In late July or early August, "[Wendy Painter]'s children persuaded her to enter a thirty day treatment program for alcohol abuse at the Betty Ford Center in California." Am. Compl. ¶ 10, ECF No. 28.[2] Wendy Painter left for California on or around August 17, 2004, but before she did, she executed a power of attorney ("POA") authorizing Defendant to purchase the Property in her name. Id. at ¶ 11; see also Am. Answer & Countercl. ¶ 9, ECF No. 30. Using that POA, Defendant purchased the Property in Wendy Painter's name on August 19 or 20, 2004. See Am. Compl. ¶ 12, ECF No. 28; Am. Answer & Countercl. ¶ 10, ECF No. 30. The total purchase price for the Property was paid for by Wendy Painter. Am. Compl. ¶ 12, ECF No. 28; Strahan Dep. 9:12–17, ECF No. 38-9.

On or about September 14 or 15, 2004, Wendy Painter completed her treatment and Defendant flew to California to accompany her home. Am. Compl. ¶ 13, ECF No. 28; Am. Answer & Countercl. ¶ 11, ECF No. 30. Nine days after she left the treatment facility, Wendy Painter caused record title of the Property to be transferred from her to herself and Defendant "as joint tenants with right of survivorship and not as tenants in common," "for and in consideration of the sum of . . .

---

[2] The current governing Amended Complaint (the "Complaint") alleges that, "[f]ollowing her separation from [her husband] Dean Painter, [Wendy Painter] had experienced debilitating depression requiring inpatient medical care, and had suffered from substance addiction and alcoholism[.]" Am. Compl. ¶ 7, ECF No. 28.

3

$5.00" (the "September Deed"). ECF No. 30-1. The September Deed was prepared by attorney David H. Crawford of the law firm Buist Moore Smythe McGee P.A. See id.

Wendy Painter was divorced from her husband Dean Painter on December 28, 2004 and equitable distribution of their property was finalized by an order signed on March 7, 2005. See Consent J. & Equitable Distribution Order ¶ 2, ECF No. 30-2. Wendy Painter and Defendant lived together until the late Spring of 2008, when Defendant moved out. See Am. Compl. ¶ 8, ECF No. 28; Strahan Dep. 45:21–24, ECF No. 45-2. Around the same time, a real estate agent named Olin Chamberlain, who had been involved in the Property's initial purchase, contacted attorney David Crawford and asked him to prepare another deed that, if executed by Wendy Painter and Defendant, would convey the Property back to Wendy Painter for her sole ownership. See Ltr From Cindy Brewer, Paralegal, To Painter & Strahan (June 12, 2008), ECF No. 50-6 at 1; Title to Real Estate, ECF No. 50-6 at 3–5. David Crawford prepared the deed as requested, but it was never returned to him. See David Crawford Dep. 73:15–22, ECF No. 77-1.

In late 2009 or early 2010, Wendy Painter was diagnosed with terminal lung cancer; she died on March 22, 2010. Am. Compl. ¶ 21, ECF No. 28; Painter Dep. 13:25–14:12, ECF No. 45-1. Upon her death, title to the Property passed by operation of law to Defendant as the sole surviving joint tenant. See S.C. Code Ann. § 27-7-40(a)(i). Wendy Painter's son, Michael Painter, was named Executor of her estate. At a gathering after Wendy Painter's funeral, Michael Painter learned, for the first time, that the Property had been deeded to both Wendy Painter and Defendant as joint tenants with rights of survivorship. Painter Dep. 36:12–20, ECF No. 45-1.

Michael Painter filed a lis pendens against the Property on behalf of Wendy Painter's Estate on April 13, 2010 (the "Lis Pendens"). See Lis Pendens, ECF No. 45-7. On April 22, 2010,

Defendant hired Olin Chamberlain[3] to sell the Property, which he listed for $2,295,000. Olin Chamberlain Dep. 79:16–21, ECF No. 38-4; Prelim. Inj. Hr'g Tr. 19:14–15, ECF No. 29.

Plaintiff filed this action against Defendant on April 30, 2010. See Original Compl., ECF No. 1. The dispute centers around the reasons that Wendy Painter executed the September Deed. Plaintiff contends that Defendant convinced Wendy Painter to execute the September Deed in abuse of their confidential relationship, by convincing Wendy Painter that if she did not transfer the Property as he suggested, "her husband might attempt to assert some ownership interest in the Property or include it in her estate for the purpose of calculating marital assets." Am. Compl. ¶ 14, ECF No. 28. Plaintiff further alleges that it was Defendant, not Wendy Painter, who

> instructed the closing attorney to prepare a Deed to the Property from [Wendy Painter] to herself and to the defendant as joint tenants with right of survivorship for the sole purpose of defeating any claim to the Property by her husband, Dean Painter, and that [Wendy Painter] was never advised of the significance of the Deed.

Id. Plaintiff alleges that Wendy Painter "had no intent to make a gift of the Property or any interest therein" to Defendant, id. at ¶ 16; he was merely "a 'straw man' who was intended to hold title to the Property as a joint tenant solely in an effort to put the Property beyond the reach of any claim [Wendy Painter] thought her husband may assert against it[.]" Id. at ¶ 18.

In the record is an affidavit from Howard P. Satisky, an attorney, who avers that Wendy Painter came to see him on August 6, 2008. Howard Satisky Aff. 1, ECF No. 11. Howard Satisky claims that, at that meeting, Wendy Painter told him that the September Deed "was signed at [Defendant]'s suggestion to keep Dean Painter's lawyers from trying to include the value of the

---

[3]  According to Michael Painter, Olin Chamberlain was also the person who first informed him that the Property was deeded to both Wendy Painter and Defendant with rights of survivorship. Painter Dep. 36:12–20, ECF No. 45-1.

5

[Property] in her share of any future equitable distribution or property settlement." Id. Wendy Painter said that Defendant "was to deed the property back to her and . . . although he had acknowledged this to her, he had failed to do so but continued to assure her that he would." Id. at 1–2. Howard Satisky also recalled that Wendy Painter told him that "she had even had a Deed drawn for [Defendant] to convey the property back to her but after she had produced the Deed for him to sign, Defendant presented her with a bill for services he allegedly rendered on her behalf and wanted the bill to be paid either immediately or when the property was sold." Id. at 2.

> Plaintiff further alleges that, during Wendy Painter's illness,
>
> [Wendy Painter] personally and through her son, Michael . . . made further attempts to have the defendant convey his record ownership interest in the Property to [Wendy Painter], but was advised by the defendant that "he would do what was right," would sign any documents necessary for the transfer of title to her, and that her son "should look after his mother."

Am. Compl. ¶ 21, ECF No. 28. As such, Plaintiff alleges that through these assurances, Defendant, "knowing of the survivorship provisions in the Deed . . . , induced [Wendy Painter] to take no legal action to seek title to the Property during her lifetime[.]" Id. at ¶ 22.

Defendant denies all of Plaintiff's allegations. He contends that it was always Wendy Painter's intention that the Property belong to both of them, because "she wanted that to be our place." Strahan Dep. 7:19, ECF No. 45-2. He denies ever suggesting that the Property be deeded jointly so as to avoid potential equitable distribution issues. Id. at 7:20–8:2. In fact, Defendant claims that Wendy Painter "wanted it titled in both our names before she left" for treatment in California, but "I did not do that. I titled it in her name." Id. at 8:17–22. Then, when Wendy Painter returned from treatment, "she insisted that we [retitle the Property in both of our names.]" Id. at 8:22–23. Defendant further testified that he and Wendy Painter reconciled approximately one year

6

after he moved out, when Wendy Painter came to visit him in Montana in May or June of 2009. Id. at 71:5–8; 83:12–86:15. During that visit, Defendant says that he and Wendy Painter had the only conversation that they ever had about his conveying the Property back to her and that Wendy Painter told him that he would "never see" the paperwork that would accomplish that transfer. Id. at 70:22–71:25. Defendant testified that he last saw Wendy Painter in October 2009 on a road trip that they took from Montana through Oregon, to California. Id. at 87:3–21. They had planned to go on to Phoenix, but Wendy Painter "wasn't feeling well, and she departed from the road trip in Fresno." Id. at 87:20–21.

As for Plaintiff's claim that Defendant induced Wendy Painter to do nothing to change the ownership of the Property by his assurances that he would do "what's right," Defendant admits that he "probably said something like that," but claims that he did not mean that he was going to transfer the Property back to Wendy Painter. Id. at 90:1–90:24. Contrary to Plaintiff's claims that Wendy Painter herself had discussions with Defendant about transferring the Property, Defendant contends that Michael Painter would not allow him to speak with Wendy Painter:

> . . . I tried on several occasions to talk to Wendy. I asked Michael, on almost every occasion we talked, I'd like to talk to Wendy. And, again, like I said, it was filtered. . . . [T]he last conversation I had with Wendy about [the Property] was that I would never see those papers, as she said. And it's my belief that that's where she wanted that house to end up with me.

Id. at 90:5–17.

On May 25, 2010, approximately one month after this action was filed, Defendant entered into an Agreement to sell the Property to Katharine Watson for a cash price of $2,000,000 (the "Sale Contract"). Agreement to Buy & Sell 1, ECF No. 38-6. Two days later, Defendant and Katharine Watson executed an amendment to the Sale Contract that addressed the Estate's Lis Pendens. The

7

amendment provided that Defendant was to obtain a release or cancellation of the Lis Pendens by June 17, 2010, or the Sale Contract would be void and Katharine Watson's earnest money would be returned. Amendment to Sale Contract, ECF No. 38-7.

On June 11, 2010, Defendant filed a motion for a preliminary injunction seeking an order from the Court requiring the Estate to release and discharge the Lis Pendens so that the sale to Katharine Watson could close. See Def.'s Prelim. Inj. Mot. 1, ECF No. 9. A hearing on Defendant's motion was scheduled for June 21, 2010. At the hearing, Defendant's attorney advised the Court that the sale had not taken place as scheduled, because the Lis Pendens was not released in time. However, the real estate agent representing the buyer had indicated that, if the Lis Pendens were lifted as a result of the hearing, the buyer would be willing to close within ten days. See Prelim. Inj. Hr'g Tr. 6:25–7:4, ECF No. 29.

In papers filed before the hearing, Plaintiff had advised that it would be willing to lift the Lis Pendens to facilitate the sale if Defendant agreed to put the net proceeds of the sale into escrow pending a resolution of Plaintiff's claims on the merits. See Pl.'s Resp. To Prelim. Inj. Mot. 3, ECF No. 14. The Court denied the motion for a preliminary injunction, primarily because Plaintiff's willingness to lift the Lis Pendens if the money were put into escrow demonstrated that Defendant had a legal remedy if he were to prevail. Prelim. Inj. Hr'g Tr. 52:13–18, ECF No. 29.

Defendant declined to agree to escrow the proceeds of the sale and Katharine Watson did not purchase the Property. However, at the hearing on the cross-motions for summary judgment, the parties informed the Court that Defendant had since changed his mind and, following his agreement to escrow the proceeds pending the outcome of this action, the Property sold to another buyer.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court looks at the record taken as a whole, with all justifiable inferences drawn in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). There is no genuine dispute of material fact when the record, viewed thus, could not lead a rational trier of fact applying the relevant law to find for the non-moving party. Id.

The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Aiken v. Policy Mgmt. Sys. Corp., 13 F.3d 138, 141 (4th Cir. 1993). "Mere speculation cannot stave off a properly supported motion for summary judgment." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp., 65 F.3d 1113, 1119 (4th Cir. 1995). Instead, to survive summary judgment, a party "must demonstrate that specific, material facts exist . . . [upon] which the jury could reasonably find [in that party's favor.]" Id. (citing Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## III. ANALYSIS

Plaintiff seeks summary judgment in its favor on Defendant's counterclaims for intentional interference with a prospective contract (First Counterclaim) and abuse of process (Second Counterclaim). For the reasons set forth herein, the Court GRANTS Plaintiff's motion.

### A. Defendant's Counterclaim for Intentional Interference With Contract Fails As a Matter of Law.

On the day after Plaintiff filed its motion for summary judgment, Defendant filed a motion to amend his counterclaim for "intentional interference with a prospective contract" to "intentional interference with an existing contract." See Def.'s Mot. To Amend, ECF No. 39; see also Partial Withdrawal of Def.'s Mot. To Amend 2, ECF No. 76 ("This proposed amendment is . . . requested since the Watson contract, which was prospective initially, became an actual contract and was improperly and vexaciously [sic] interfered with when the Plaintiff Estate refused to lift the Lis Pendens, causing the Watson contract to terminate on June 18, 2010.").[4] At the hearing, Defendant's counsel agreed that, given the motion to amend, he has abandoned his claim for intentional interference with a prospective contract. Therefore, the Court need only decide whether Defendant may maintain a claim that Plaintiff intentionally interfered with the contract of sale when it refused to lift the Lis Pendens absent Defendant's agreement to escrow the proceeds.

Defendant cannot prevail on his claim for intentional interference with contract because, as he acknowledged both in his papers and at oral argument, neither party to the contract with which Plaintiff allegedly intentionally interfered actually breached that agreement. See, e.g., Def.'s Resp. 9 n.58, ECF No. 45. In South Carolina, "[a]n essential element to the cause of action for tortious interference with contractual relations requires the intentional procurement of the contract's breach." Eldeco, Inc. v. Charleston Cnty. Sch. Dist., 642 S.E.2d 726, 732 (S.C. 2007) (citing Kinard v.

---

[4] Defendant's motion to amend also originally sought to add a sixteenth affirmative defense of "unclean hands" and a sixth cause of action for "intentional interference with a third party real estate agent's claim to a commission." See Def.'s Mot. To Amend 1, ECF No. 39. Defendant has since withdrawn these proposed amendments. See Partial Withdrawal of Def.'s Mot. To Amend 1, ECF No. 76.

Crosby, 433 S.E.2d 835, 837 (S.C. 1993)). In other words, "[w]here there is no breach of the contract, there can be no recovery." Id. (citing First Union Mortg. Corp. v. Thomas, 451 S.E.2d 907, 913 (S.C. Ct. App. 1994)). As such, Defendant's claim fails as a matter of law and his proposed amendment would be futile.

> **B.     Defendant Fails To Set Forth Evidence To Support His Counterclaim for Abuse of Process.**

Defendant alleges that "by filing a Lis Pendens and bringing an action that has no merit," Plaintiff has committed the tort of abuse of process, because it "has used the processes of this Court for an improper purpose[.]" Am. Answer & Countercl. ¶ 48, ECF No. 30.  For the reasons discussed below, the Court finds that Defendant has failed to set forth sufficient evidence to support this claim; therefore, summary judgment in Plaintiff's favor is GRANTED.

The tort of abuse of process "provides a remedy for one damaged by another's perversion of a legal procedure for a purpose not intended by the procedure." Argoe v. Three Rivers Behavioral Center & Psychiatric Solutions, 697 S.E.2d 551, 556 (S.C. 2010) (citing Food Lion, Inc. v. United Food Commercial Workers Int'l Union, 567 S.E.2d 251, 253 (S.C. Ct. App. 2002). It has two essential elements: the tortfeasor must have an "ulterior purpose" and must undertake a "willful act in the use of the process not proper in the conduct of the proceeding." Id. (quoting Hainer v. Am. Med. Intern., Inc., 492 S.E.2d 103, 107 (S.C. 1997)). The willful act element itself is "comprise[d of] three components: 1) a 'willful' or overt act 2) 'in the use of the process' 3) that is improper because it is either (a) unauthorized or (b) aimed at an illegitimate collateral objective." Food Lion, Inc., 567 S.E.2d at 253–54. Importantly, "liability [for abuse of process] exists not because a party merely seeks to gain a collateral advantage by using some legal process, but because the collateral

objective was its sole or paramount reason for acting." Id. at 256. Summary judgment on a claim for abuse of process is proper where the party asserting the claim fails to set forth evidence that satisfies these elements. See S. Glass & Plastics Co. v. Duke, 626 S.E.2d 19, 23–24 (S.C. Ct. App. 2005).

Defendant's abuse of process claim rests entirely on his conclusion that "Plaintiff has no legal claim to the Property." Def.'s Resp. 17, ECF No. 45. But if that were sufficient, then virtually any defendant inclined to allege it could survive summary judgment on an abuse of process claim. Without more, Defendant's conclusory assertion that Plaintiff filed the Lis Pendens and proceeded with this action for the sole or paramount purpose to force Defendant to settle a meritless claim cannot sustain his abuse of process claim beyond summary judgment.

## IV.  CONCLUSION

For the reasons stated herein, the Court GRANTS Plaintiff's motion for partial summary judgment, ECF No. 38, and DENIES Defendant's motion to amend his counterclaims, ECF No. 39.

IT IS ORDERED.

/s/ Margaret B. Seymour
United States District Judge

February 2, 2011
Columbia, South Carolina